# Richmond

STANDARD DRUG COMPANY, INCORPORATED v. GENERAL ELECTRIC COMPANY.

November 28, 1960.

Record No. 5136.

Present, All the Justices.

The opinion states the case.

*George E. Haw* and *Robert A. Cox, Jr.* (*George E. Haw, Jr.; LeRoy R. Cohen, Jr.; Haw and Haw; Cohen, Cox and Kelly,* on brief), for the plaintiff in error.

*Walter E. Rogers* (*T. E. Munson; Williams, Mullen, Pollard and Rogers,* on brief), for the defendant in error.

*Morton L. Wallerstein* and *Henry T. Wickham,* on brief), for Virginia Farm Equipment Association, Virginia Jewelers Association, Virginia Pharmaceutical Association, Virginia Retail Hardware Association and Virginia Retail Merchants Association, amici curiae.

MILLER, J., delivered the opinion of the court.

A motion for a declaratory judgment under § 8-578, *et seq.,* Code 1950, was filed by Standard Drug Company, Incorporated, a Virginia corporation, against the General Electric Company, a New York corporation authorized to do business in Virginia. The object of the proceeding was to have the court declare the Fair Trade Act unconstitutional and invalid, and adjudicate that General Electric may not fix the retail prices to be charged by Standard for flashbulbs purchased by it from General Electric.

In paragraphs one to six, inclusive, of Standard's motion it is alleged that General Electric is engaged in the manufacture, distribution and sale at wholesale of flashbulbs and other commodities; that Standard is engaged in sale at retail of flashbulbs and other commodities; that by letter of June 9, 1958, from General Electric, which included a schedule of prices, Standard was advised that effective June 27, 1958 (the day the "Fair Trade Act" became effective), General Electric was fair trading its flashbulbs in Virginia, and Standard was requested to observe the retail fair trade prices and referred to the list of fair trade prices on flashbulbs; that Standard's receipt of the letter with the list of fair trade minimum retail prices attached, together with the purchase by Standard, since receipt of the letter, of flashbulbs from General Electric for resale is within the statutory definition of a contract set forth in the act purporting to require resale at prices not less than those specified by General Electric. It is then alleged that subsequent to June 27, 1958, Standard sold flashbulbs purchased from General Electric both before and subsequent to that date at retail prices determined solely by Standard "and for less than the retail prices prescribed by" General Electric.

In paragraphs 7 and 8 of the motion it is charged that the Fair Trade Act is in restraint of Standard's right to conduct its lawful business and violative of §§ 1 and 11, Constitution of Virginia; constitutes unconstitutional delegation of legislative power to private indivduals and corporations in violation of § 40; creates arbitrary and unreasonable classification and grants special rights and privileges to General Electric and others similarly situated in violation of § 63(18); violates § 52 by failing to express the object of the act in the title; authorizes monopolies inimical to the public welfare in violation of § 164, as implemented by the Virginia Anti-monopoly Act, §§ 59-20 to 59-40, Code 1950, as amended, and is therefore illegal and void. It is prayed that the Fair Trade Act be declared unconstitutional and of no effect.

In its grounds of defense General Electric admitted the allegations of paragraphs one to six, inclusive, but denied that the Fair Trade Act violated the Constitution of Virginia or the Virginia Anti-monopoly Act. It specifically asserted that when Standard received the notice of June 9, 1958, with schedule of flashbulb prices attached, advising it that as of June 27, 1958, General Electric was fair trading its flashbulbs, and with such notice, accepted the bulbs, then by

acceptance it agreed to sell the goods at the specified minimum retail sales price.

In a stipulation the litigants agreed that the factual allegations in paragraphs one to six of Standard's motion, which are summarized above, are true. It was also agreed:

I. That pursuant to invoice No. 81888, dated August 29, 1958, General Electric shipped and charged to Standard a quantity of flashbulbs manufactured by it, including 600 standard packages bearing the General Electric trademark of PH 5 flashbulbs which were duly delivered to Standard.

II. That at the time of the purchase and delivery of these flashbulbs Standard had in its possession "a list of fair trade minimum retail prices" for General Electric flashbulbs specifying that General Electric PH 5 flashbulbs should be sold for $0.14 each, or $1.59 "per pack of 12."

III. That by advertisement of October 23, 1958, in the Richmond News Leader, a newspaper of general circulation, Standard offered said PH 5 flashbulbs for sale at $0.12 each, or $1.39 per pack of 12, and pursuant to the advertisement, sold the flashbulbs for $0.12 each and at $1.39 per pack of 12 to various customers on that and subsequent days.

The case was submitted upon the pleadings and stipulation of fact. After oral argument, the trial court entered an order holding the Fair Trade Act constitutional and valid, and declared that General Electric might, in the manner provided by the act, fix the minimum retail prices to be charged for flashbulbs sold by it. We granted Standard an appeal.

In argument at bar it was stated by counsel for the litigants that the flashbulbs shipped by General Electric and received by Standard are "in free and open competition with commodities of the same general class produced or distributed by others."

Though the motion for judgment contains no specific allegation that the legislation violates the Constitution of the United States, yet during the trial in the lower court and by its assignments of error, it appears that Standard asserted and litigated the question of whether or not the act violates the Fifth and Fourteenth Amendments of the Constitution of the United States.

The pertinent parts of the Fair Trade Act follow:

"59-8.2. The following terms, as used in this chapter, are hereby defined as follows:

"(1) 'Commodity' means any subject of commerce, except [certain enumerated foods and wearing apparel.]

\*     \*     \*     \*     \*     \*     \*

"(3) 'Producer' means any grower, baker, maker, manufacturer, bottler, packer, converter, processor or publisher.

"(4) 'Distributor' means any person who identifies a commodity distributed by him by the use of his trade-mark or trade name.

"(5) 'Wholesaler' means any person who buys a commodity for the purpose of resale.

"(6) 'Retailer' means any person selling a commodity to a consumer for use.

"(7) 'Trade-mark' means any word, name, symbol or device, or any combination thereof used by a producer or distributor to identify his commodity and distinguish it from that produced or distributed by others.

\*     \*     \*     \*     \*     \*     \*

"(10) 'Contract' means any agreement, written or verbal, or actual notice imparted by mail or attached to the commodity or containers thereof.

"The acceptance of a commodity for resale, after notice imparted by mail or attached to the commodity or containers thereof, shall be prima facie evidence of actual notice of the terms of the 'contract'. Acceptance for resale with actual notice shall be deemed to be assent to the terms of the 'contract.'

"§ 59-8.3. No contract relating to the sale or resale of a commodity which bears, or the label or container of which bears, the trade-mark or trade name of the producer or distributor of such commodity and which commodity is in free and open competition with commodities of the same general class produced or distributed by others shall be deemed in violation of any law of the State by reason of any of the following provisions which may be contained in such contract:

"(a) That the buyer will not resell such commodity at less than the minimum price stipulated by the seller;

\*     \*     \*     \*     \*     \*     \*

"59-8.5. No minimum resale price shall be established for any commodity by any person other than the owner of the trade-mark or trade name used in connection with such commodity or a wholesaler

specifically authorized to establish such price by the owner of such trade-mark or trade name.

\*      \*      \*      \*      \*      \*      \*

"59-8.7. Willfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract is unfair competition and is actionable at the suit of any person damaged thereby."

Section 9 of the act declares that its purposes are, among others enumerated, to protect small business, to safeguard the goodwill of trade-marks and trade names, and further wholesome competition, to prevent monopoly, and to promote the public welfare.

It is enlightening to observe that in the case of *Benrus Watch Co., Inc.* v. *Kirsch*, 198 Va. 94, 92 S. E. 2d 384, decided in the Law and Equity Court of the City of Richmond in 1955, Judge Young of that court held that the "non-signer" provision, *i.e.*, § 59-7, Code 1950[1], of the then Fair Trade Act (ch. 1, title 59, Code 1950) was in conflict with and repealed by §§ 59-20 and 59-40, Code 1950, of the Anti-monopoly Act, which sections had been amended and re-enacted subsequent to enactment of the Fair Trade Act. He also decided that § 59-7 violated the liberty and due process clauses, *i.e.*, §§ 1 and 11, of the Virginia Constitution, and violated §§ 40 and 52 of our Constitution. Upon appeal we sustained the trial court's invalidation of § 59-7 by holding that the Fair Trade Act was in conflict with the subsequently amended sections of the Anti-monopoly Act and had been repealed by implication. We found it unnecessary to determine whether or not the "non-signer" provision then embodied in § 59-7 was unconstitutional as had been determined by the trial court.

In his opinion holding § 59-7 of the former act unconstitutional, Judge Young stated that "the validity of voluntary price maintenance contracts, as between the parties thereto, is not before me and I express no opinion with reference thereto." His views on the constitutional questions were limited to the "non-signer" provisions of § 59-7. Similar provisions have been held invalid in a number of

---

[1] § 59-7. "Willfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of this chapter, whether the person so advertising, offering for sale or selling is or is not a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby."

states while being upheld in a number of others. See CCH Trade Regulation Reports, Paragraph 3003.

When the General Assembly re-enacted the Fair Trade Act in 1958, it is clear that in doing so it had in mind the litigation in the *Benrus* case. By § 59-8.9 it reaffirmed the declaration of legislative policy that Fair Trade agreements should not be considered illegal, which was the result brought about by the 1950 amendment to the Anti-monopoly Act. It is also obvious that the legislature desired and undertook to eliminate unconstitutional infirmities, if any, that may have existed in the former act. This is made evident by the elimination of the coercive "non-signer" provision of § 59-7 of the former act and inclusion of the permissively contractual provision of § 2(10) of the 1958 Act (§ 59-8.2, 1960 Cum. Supp., Code 1950.)

A majority of the courts that have upheld the Fair Trade Acts from attacks on constitutional grounds have, we think, been led to that conclusion by the decision of the Supreme Court in the case of *Old Dearborn Distributing Co.* v. *Seagram-Distillers Corp.,* 299 U. S. 183, 57 S. Ct. 139, 81 L. ed. 109, 106 A. L. R. 1476 (1936).

The *Old Dearborn* case dealt with the validity of § 1 of the Illinois Fair Trade Act (comparable to the pertinent part of § 59-8.3 of the present Virginia act) and § 2, the non-signer section of the Illinois act (comparable to § 59-7, the non-signer provision of the former Virginia act) under the Due Process and Equal Protection clauses of the Fifth and Fourteenth Amendments of the United States Constitution. It was held that while the right of the owner of property to fix the price at which he will sell it is an inherent attribute of the property itself, protected by the Fifth and Fourteenth Amendments and generally not to be denied by legislative enactment, yet that principle related only to legislative price fixing and not to fixing prices of "identified" goods under legislative leave by contract between the parties; that the Illinois act did not attempt to fix prices nor delegate such power to private persons, but permitted the designated private persons to contract with respect thereto. The court said that the primary aim of the non-signer provision was to protect the property, namely, the goodwill, of the producer, which he still owned, and the price restriction was adopted as an appropriate means to that legitimate end, not as an end in itself.

It was held that the non-signer section was not so arbitrary, unfair or unreasonable as to constitute a denial of due process, because it

dealt not with a commodity alone, but with a commodity plus its brand or trade-mark; that the vendee owns the commodity but not the goodwill that the trade-mark symbolizes; that the non-signer clause "does not prevent a purchaser of the commodity bearing the mark from selling the commodity alone at any price he pleases. It interferes only when he sells with the aid of the good will of the vendor; and it interferes then only to protect that good will against injury. * * * There is nothing in the act to preclude the purchaser from removing the mark or brand from the commodity—thus separating the physical property, which he owns, from the good will, which is the property of another—and then selling the commodity at his own price, provided he can do so without utilizing the good will of the latter as an aid to that end." 299 U. S. at 195, 57 S. Ct. at 145.

The challenged legislation is not fairly comparable to that involved in *Young* v. *Commonwealth*, 101 Va. 853, 45 S. E. 327, where the State, by force of the legislation alone, attempted to prohibit or regulate a lawful business not affected with a public interest or prescribe the manner in which it should be conducted. In the *Young* case a statute by which the legislature sought to prohibit the use of trading stamps in connection with the sale of goods was attacked, and the court held that use of trading stamps was a legitimate activity and could not be prohibited by the State. For the State to prohibit their use by legislation was declared to be violative of § 1, Constitution of Virginia, and the Fourteenth Amendment to the Constitution of the United States. The court said:

"The word 'liberty', as used in the Constitution of the United States and the several States, has frequently been construed, and means more than mere freedom from restraint. * * * The liberty mentioned is deemed to embrace the right of the citizen * * * to earn his livelihood by any lawful calling, and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purpose above mentioned. * * *" (At pages 862, 863.)

The admitted facts established that Standard, the retailer, contracted directly with General Electric, the manufacturer of the trade-marked flashbulbs, and when the purchase was made, Standard, by the express terms of the contract, agreed not to resell at less than specified minimum prices. It cannot now justly complain because it is not free to use and impair the goodwill of General Electric by selling the bulbs at a price less than it agreed to maintain.

"* * * Contracts or agreements convey the idea of a cooperative arrangement, not a program whereby recalcitrants are dragged in by the heels and compelled to submit to price fixing. * * *" 19 A. L. R. 2d at 1129.

No provision of the act impinges upon §§ 1 and 11, Constitution of Virginia, or upon the Due Process clauses of the Fifth and the Fourteenth Amendments to the Constitution of the United States.

It was also held in *Old Dearborn* that the non-signer provision did not constitute arbitrary or special legislation infringing upon the Equal Protection clause of the Fourteenth Amendment because it represented a reasonable classification as between trade-marked and unmarked goods.

It appears that not only does the present Virginia act clearly meet the conditions required by *Old Dearborn* for constitutional validity (state and federal), but by elimination of the "non-signer" provision and substitution of the provision that permits the voluntary contractual restriction on minimum resale price to be agreed upon by the manufacturer or distributor and retailer, it has removed the chief ground and reason relied upon by courts that have held Fair Trade Acts to be unconstitutional.

With the "non-signer" provision eliminated, and upon the authority of *Old Dearborn*, we have no difficulty in holding that the act is not in violation of the Constitution of the United States.

Standard's next contention is that the act delegates power to private persons in violation of § 40 of our Constitution. This constitutional provision ordains that the legislative power shall be "vested in a General Assembly. * * *" A statute delegating this power to private persons violates this provision and is invalid. In *Board of Supervisors* v. *State Milk Comm.*, 191 Va. 1, 4, 60 S. E. 2d 35, 37, quoting from *Highland Farms Dairy* v. *Agnew*, 300 U. S. 608, 57 S. Ct. 549, 81 L. ed. 835, it is said: " 'Delegation to official agencies is one thing, * * * delegation to private interests or unofficial groups with arbitrary capacity to make their will prevail as law may be something very different.' " Of like effect is *Chapel* v. *Commonwealth*, 197 Va. 406, 89 S. E. 2d 337.

By our Fair Trade Act no one or more persons are given authority to fix generally the price of any commodity. Not even the manufacturer of a commodity bearing his trade-mark is given the power to fix the retail price of the commodity in the hands of one who ac-

quired it without a pre-existing restriction on its use or disposition. Here the restriction imposed by the manufacturer or producer was agreed to by the retailer when, with full knowledge of the restriction, he acquired and accepted the flashbulbs. No compulsion is practiced and no retailer is bound except by his own agreement.

What was said in *Old Dearborn* is dispositive of the contention that the act violates § 40. It follows:

"* * * It is clear that this section does not attempt to fix prices, nor does it delegate such power to private persons. It *permits* the designated private persons to contract with respect thereto. It contains no element of compulsion but simply legalizes their acts, leaving them free to enter into the authorized contract or not as they may see fit. Thus far, the act plainly is not open to objection; and none seems to be made." (At page 192.)

■ Does the Fair Trade Act violate § 63 (18)[2] by creating arbitrary and unreasonable classifications. This section of our Constitution has been construed and applied in numerous decisions. *Martin's Ex'rs* v. *Commonwealth*, 126 Va. 603, 102 S. E. 724; *Joyner* v. *Centre Motor Co.*, 192 Va. 627, 66 S. E. 2d 469; *Green* v. *County Board*, 193 Va. 284, 68 S. E. 2d 516; *Finance Corp.* v. *Londeree*, 200 Va. 607, 106 S. E. 2d 760.

In *Joyner* v. *Centre Motor Company*, *supra*, we quoted with approval *Martin's Ex'rs* v. *Commonwealth* and said at page 632:

" 'A law is "special in a constitutional sense when by force of an inherent limitation it arbitrarily separates some persons, places or things from those upon which, but for such separation, it would operate." ' (126 Va. 610)

"Reasonably satisfactory as that definition is, we must still, in each instance, determine if the Act makes an 'arbitrary separation' of 'persons, places or things.' For as stated by Judge Kelly at p. 610 in *Martin* v. *Commonwealth*, *supra*, whether there has been such an 'arbitrary separation * * * must in the nature of things depend upon the person [purpose] and subject of the particular act and the circumstances and conditions surrounding its passage.' "

Section 59-8.3 classifies commodities that bear or the label or

---

[2] "The General Assembly shall not enact any local, special or private law in the following cases:

\* \* \* \* \*

"18. Granting to any private corporation, association or individual any special or exclusive right, privilege or immunity."

container of which bears the trade-mark or trade name of the producer or distributor and which are in free and open competition with commodities of the same general class produced by others. An article or commodity which bears the brand or trade-mark of the manufacturer or distributor represents and embodies the goodwill of the manufacturer or producer.

For the purpose of this litigation it may be said that the "goodwill" of the manufacturer or producer is that intangible property right or asset created in the public mind by the skill, experience, dependability and integrity of the manufacturer or producer of the commodity, and the trade-mark or trade name is the symbol of those qualities and constitutes an inseparable part of the goodwill. It is a valuable aid to the growth and enlargement of the business. The owner or proprietor of the goodwill symbolized by his trade-mark is entitled to protection in his property right, and it cannot now be doubted that commodities bearing and identified by the trade-mark, brand or name of the producer or distributor that are in free and open competition with commodities of the same general class are proper subjects of legislative classification. This was decided in *Old Dearborn* when it was said:

"* * * As this court many times has said, the equal-protection clause does not preclude the states from resort to classification for the purposes of legislation. It only requires that the classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' * * *

"* * * Enough appears already in this opinion to show the essential difference between trade-marked goods and others not so identified. * * *" (At page 197.)

■ We find no merit in the contention that the title of this act does not meet the requirements of § 52, which declares that "No law shall embrace more than one object which shall be expressed in its title; * * *."

The title, among other things, states that it is an act to permit any producer or distributor to prescribe minimum resale prices of a commodity bearing the trade-mark, brand or name of the producer or distributor that is in free and open competition with commodities of the same class. It also notifies the reader that the act defines terms,

provides for the giving of notice of the minimum resale price and declares that intentional violation is unfair competition. Undoubtedly this title states the object of the act and is sufficiently clear to apprise the public and members of the legislature of the subject of legislation and give them notice of the purpose and contents of the act. *Town of Narrows* v. *Giles County*, 128 Va. 572, 105 S .E. 82; 82 C. J. S., Statutes, § 219, p. 364; 50 Am. Jur., Statutes, § 166, p. 146.

Section 165 of the Constitution is a direction to the General Assembly to enact legislation preventing trusts, combinations and monopolies inimical to the public welfare. Standard asserts that §§ 59-20 and 59-40, Code 1950, as amended, referred to herein as the Anti-monopoly Act, implement the constitutional provision, and that they are in conflict with the Fair Trade Act. It is then argued that as they implement the mandatory section of the Constitution, they should prevail over the later enacted Fair Trade Act. With this last contention, that the former amendment should prevail over the latter act, we cannot agree.

Section 165 is not self executing, nor does it undertake to define or declare what shall constitute trusts, combinations or monopolies inimical to the public. It leaves that to the wisdom of the General Asembly. It is evident that since enactment of the first Fair Trade Act in 1936, that body has considered that agreements between manufacturers of trade-marked commodities and retailers of such articles establishing minimum retail prices do not create combinations or monopolies inimical to the public welfare. This is made doubly plain by the re-enactment of the Fair Trade Act subsequent to Judge Young's decision in *Benrus Watch Co., Inc.* v. *Kirsch, supra,* and by the legislative declaration of policy and purposes in § 59-8.9. Among other things, it is there declared that the act is "to further wholesome competition, to prevent monopoly, and to promote the public welfare. * * *"

If the Fair Trade Act of 1958 be, as asserted by Standard, in irreconcilable conflict with §§ 59-20 and 59-40, which we need not and do not determine, yet under familiar rules of statutory construction, the latter enactment, *i.e.*, the Fair Trade Act of 1958 would prevail.

" 'Repeal by implication is not favored and the firmly established principle of law is, that where two statutes are in apparent conflict, it is the duty of the court, if it be reasonably possible, to give to

them such a construction as will give force and effect to each.' *Scott v. Lichford,* 164 Va. 419, 422, 180 S. E. 393, 394. *Danville v. Ragland,* 175 Va. 27, 7 S .E. (2d) 121.

"But if a later statute does not by its terms or by necessary implication repeal entirely a former one *in pari materia,* yet if it clearly appears that the later statute was intended to furnish the only rule to govern a particular case, it repeals the former to that extent. And in deciding that question 'the occasion and the reason of the enactment, the letter of the act, the context, the spirit of the act, the subject matter and the provisions of the act, have all to be considered.' *Fox v. Commonwealh,* 16 Gratt. (57 Va.) 1, 10. * * *" *American Cyanamid Co.* v. *Commonwealth,* 187 Va. 831, 841, 48 S. E. 2d 279.

If the sections of the Anti-monopoly Act that were enacted prior to the 1958 Fair Trade Act be in conflict with the latter act, then the former sections would be repealed *pro tanto* or insofar as they are in conflict with the Fair Trade Act. 17 M.J., Statutes, §§ 91, 96; *American Cyanamid Co.* v. *Commonwealth, supra.*

■ Standard insists that the Fair Trade Act is in conflict with the Sherman Anti-Trust Act and void because the Virginia Act is in restraint of trade by authorizing price fixing without a voluntary agreement or contract of any kind.

We are mindful that in defining the term "contract", the first sentence of § 59-8.2(10) says " 'Contract' means any agreement, written or verbal, or actual notice imparted by mail or attached to the commodity or container thereof." Obviously *actual notice* imparted by mail or attached to a commodity, without more, is not a contract. We are confident that the legislature did not mean that the mere notice attached to the commodity constituted a contract between the manufacturer and retailer. Nor are we limited to this single sentence defining "contract" in determining the legislative intent. We may and should look to other pertinent and explanatory parts of the act. 17 M. J., Statutes, §§ 41, 42, and 43. Interpretation of the legislative meaning and intent may be obtained by considering the second paragraph of subsection (10) and § 59-8.3. When that is done, it is quite obvious that the notice is the offer to make a contract. Acceptance of the commodity for resale with notice attached stating its minimum retail price constitutes *prima facie* evidence of actual notice to the retailer of the imposed minimum resale price; acceptance with *actual* notice of the minimum resale price is deemed assent to

the terms imposed in the notice. Voluntary acceptance of the commodity with actual notice of the imposed minimum retail price creates the contract.

In 1911 the Supreme Court decided in *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.*, 220 U. S. 373, 31 S. Ct. 376, 55 L. ed. 502, that a contract between a manufacturer of a commodity and a retailer fixing the price at which the commodity was to be sold to the public was an unlawful restraint of trade at common law, and where interstate commerce was involved, it violated the Sherman Anti-Trust Act (26 Stat. 209, ch. 647, 15 U.S.C.A. §§ 1-7).

Subsequent to this the *Old Dearborn* case (1936) held that the Illinois Fair Trade Act, containing a non-signer provision was valid as applied to *intrastate* commerce.

In 1937 the Miller-Tydings amendment to the Sherman Anti-Trust Act (50 Stat. 693, 15 U.S.C.A. § 1) was passed, which exempted from the provisions of the federal act contracts prescribing minimum prices of trade-marked commodities in intrastate commerce if the laws of the state so permitted. Then in 1951 *Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U. S. 384, 71 S. Ct. 745, 95 L. ed. 1035, held that enforcement of the price arrangement against a non-signer violated the Sherman Act since only *voluntary* minimum price arrangements were excepted by the Miller-Tydings amendment.

The McGuire Act (1952) (66 Stat. 632, 15 U.S.C.A. § 45(a)) in amending the Sherman Act exempted from the prohibitions of that Act the non-signer provisions of state fair trade laws. This amendment has been held constitutional in *Schwegmann Bros. Giant Super Markets* v. *Eli Lilly & Co.*, 205 F. 2d 788 (5th Cir. 1953); cert. denied, 346 U. S. 856, 98 L. ed. 369; rehearing denied, 346 U. S. 905, 98 L. ed. 404 (1953).

Standard argues that the McGuire Act exempts from the Sherman Act only statutes binding non-signers to observe minimum resale prices specified in contracts or agreements of which they have knowledge. It maintains that the Virginia Act does not fall within the terms of the exemption because the term "contract" as defined by the Act is no contract, but merely a stipulation by the seller made a "contract" by legislative fiat regardless of assent by the buyer. In short, Standard asserts and argues that the law authorizes price

fixing without contractual agreement of any kind, and thus it is in conflict with the Sherman Anti-Trust Act and void.

We cannot agree with this contention and analysis of the pertinent acts. Here there is no legislative price fixing; the restriction against selling the trade-marked goods at less than a specified minimum price is limited to voluntary agreements. The challenged provisions of § 59-8.2 (10) are not compulsory, but merely permissive and evidential. The entire agreement made between the manufacturer of the trade-marked commodity and the retailer, embodying the restriction as to its minimum retail price, is not imposed by law; it is voluntary, and the agreement constitutes a contract within the meaning of the pertinent federal and state legislation.

For the reasons stated, the declaratory judgment of the trial court is affirmed.

*Affirmed.*